Dolly PLUMB, et al., Plaintiffs
and Appellees,

v.

STATE of Utah, et al., Defendants.

Malcolm A. Misuraca, Haley & Stolebar-
ger, Douglas B. Provencher, and
Beyers, Costin & Case, Appellants.

No. 900012.

Supreme Court of Utah.

Dec. 10, 1990.

Jackson Howard, Leslie W. Slaugh, Provo, for appellants.

Craig G. Adamson, Stewart M. Hanson, Jr., Salt Lake City, for plaintiffs and appellees.

ZIMMERMAN, Justice:

Appellants Malcolm A. Misuraca, Haley & Stolebarger, Douglas B. Provencher, and Beyers, Costin & Case (collectively "class

counsel") seek an award of attorney fees consistent with a stipulation between them and the class they represented in the underlying action. The stipulation was entered after the lower court reduced the amount of fees in accordance with the recommendations of a special master. The court had originally appointed the special master to determine the reasonableness of costs incurred by class counsel. We approve the stipulation in part and remand for an award of attorney fees consistent with this opinion.

Class counsel challenge as inadequate the district court's award of attorney fees for work done in their role as counsel for plaintiffs in a class action brought under Utah Rule of Civil Procedure 23. Appellees Dolly Plumb, et al., are the named plaintiffs representing the class, which consists of approximately seven thousand persons holding approximately seventeen thousand accounts in five failed thrift institutions located in the state of Utah. After the failure of the thrift institutions, the named plaintiffs employed class counsel to bring a class action to recover money, estimated at over $100,000,000, that members of the class had on deposit with the failed institutions. The class representatives and class counsel entered into a written agreement pursuant to which class counsel would be paid a "reasonable fee" to be determined as a percentage of any future recovery. The agreement provided that a reasonable fee would be between 20 and 40 percent of the recovery, but recognized that the trial court would have ultimate discretion in fixing the fee.

Plaintiffs filed the underlying action on July 20, 1987, alleging that the State of Utah, through its commissioner of financial institutions, violated Utah law by (i) allowing the taking of deposits in insolvent institutions, *see* Utah Code Ann. § 76–6–512 (1990); (ii) mishandling fiduciary deposits, resulting in their loss or jeopardy, *see id.* § 76–6–513 (1990); (iii) allowing thrifts to go below their statutory minimum capital requirements, *see id.* § 7–8–5(5) (Supp. 1990); and (iv) not notifying the county attorney that certain insolvent thrifts were in violation of the financial institutions law, *see id.* § 7–1–319 (1982).

After months of negotiation, a settlement of the claim against the State of Utah was reached between the class representatives, the State, and the State's insurer. Under this settlement, the class was to be paid $44,000,000 to dispose of the claims against the State. A portion of the settlement, $15,000,000, consisted of funds advanced by the State that were to be repaid out of any amounts recovered upon the liquidation of assets of the failed thrifts.

On October 24, 1988, class counsel filed a motion under Utah Rule of Civil Procedure 23 for certification of the class for settlement purposes, as well as a motion under rule 54(b) for certification for interlocutory appeal of any order approving the settlement. The principal defendants stipulated to the motion.

On October 31, 1988, the trial court granted a motion for preliminary approval of the settlement and approved a form of notice to be sent to all class members. Thereafter, documents outlining the proposed settlement were mailed to all known thrift depositors and published in various newspapers. Depositors were allowed to "opt out" of the class if they wished by returning a card so indicating. Those not opting out were asked to return a ballot indicating whether they favored accepting the settlement. The description of the negotiated settlement informed the depositors that class counsel intended to request attorney fees of $7,250,000. This figure represents 25 percent of $29,000,000 (the $44,-000,000 recovery less the $15,000,000 advanced by the State). Some 99.9 percent of the depositors who responded to the notice voted to accept the settlement as negotiated.

On November 30, 1988, the trial court held a further hearing on the proposed settlement and on the request for attorney fees. In a memorandum decision dated December 5th and an order dated December 6th, the court, inter alia, approved the settlement and awarded attorney fees of $5,800,000. This award represents 20 percent of $29,000,000. Because the claim for

attorney fees and the request for approval of the settlement did not dispose of the entire litigation, the order was interlocutory and left a number of questions unanswered, such as how the reimbursement of costs incurred by counsel and the class representatives, as well as payment of unpaid costs and expenses, were to be handled.

To assist in resolving these technical issues, in its December 6th order the trial court appointed as special master one James U. Jensen, an attorney ("the special master"), "for the purpose of reviewing requests for cost reimbursements." Despite the narrow wording of the order of appointment, the special master apparently understood his charge to include making a review of the interlocutory award of attorney fees.

On December 16, 1988, only ten days after the order appointing him, without holding hearings of any kind, the special master submitted his first interim report. This report was adopted by the trial court, without notice or hearing, by an order entered the same day. In line with the special master's recommendations, the trial court's December 16th order modified its December 6th order by withholding 33 percent of the attorney fee award and by requiring that a substantial portion of the costs and expenses of litigation be borne by class counsel.

In his third interim report,[1] dated May 2, 1989, the special master recommended that the fee approved in the December 6th order be reduced by one-third, to $3,900,000. In the period between his appointment and the issuance of this third report, the special master did not hold any hearings or take any evidence on the record. From his time records and his report, it appears that during this period he researched the applicable law on attorney fees and reviewed the records of work done by class counsel. In his third interim report, the special master stated that the grounds for his proposed reduction of attorney fees were, first, the incomplete guidance as to the applicable law given to the trial court by class counsel with regard to how a "reasonable" award of attorney fees should be determined, and second, the lack of an "adversarial situation" as to counsels' fees because the class representative acquiesced in the class counsel's request for fees.

Class counsel moved to strike the special master's recommendation and report on several grounds, one of which was that they had no notice that the fee issue was being reconsidered. They also moved to vacate the appointment of the special master and filed a formal request for oral argument on the motions. The trial court held no oral argument, but filed three minute entries on July 5, 1989, which summarily denied the motions and attempted to "clarify" the authority of the special master by retroactively empowering him to consider the reasonableness of attorney fees.

Class counsel then requested that the special master hold a hearing on the attorney fees issue and asked for two days to present evidence. The special master held a hearing on July 8th, but limited class counsel to two hours to make a presentation, instead of the two days requested. The master also ordered that the testimony could be submitted by proffer. Six days later, on July 14, 1989, the special master filed his final report on costs and fees of class counsel and service providers. The final report withdrew the recommendations regarding attorney fees made in the third interim report. Instead, the master "advised" the trial court as to what legal and factual standards it should apply in determining a reasonable attorney fee.

On July 17, 1989, the trial court held a hearing at which parties were given the opportunity to present oral argument on the issue of attorney fees; however, they specifically were not allowed to present evidence. In an order dated July 17, 1989, the court amended the December 6th order by expanding the master's authority to in-

---

**1.** The special master's second interim report in February of 1989 related to Arthur Anderson & Company, another special master.

clude within its scope what the master had actually done. Where the original order directed the special master to review "requests for cost reimbursements," the July 17th order directed him to "inquire into all costs and fees, including the attorneys' fees and costs" involved in the matter. The trial court filed a final memorandum decision on October 31, 1989. In it, the court modified its December 5, 1988 order by reducing the attorney fees award from $5,800,000 to $4,250,000. Class counsel sought a rule 54(b) certification of appeal from this order, and the court granted certification on January 2, 1990. This appeal followed.[2]

Class counsel make four basic arguments: (i) the trial court erred in refusing to enter an order consistent with the agreement between class counsel and the class representatives; (ii) the law-of-the-case doctrine precludes the trial court from reassessing its order of December 6, 1988, which initially fixed the fee; (iii) the trial court abused its discretion by using a lodestar approach to determine the amount of the fee; and (iv) the proceedings before the special master were conducted in an improper manner and tainted the court's ruling of October 31, 1989. The remedy sought is vacation of the October 31st order and reinstatement of the December 6th order.[3]

■■■ We first address the claim that the trial court was somehow bound by the fee agreement between the class representatives and class counsel. In making this argument, class counsel misperceive the basic equitable nature of a class action. The cases and commentators dealing with Federal Rule of Civil Procedure 23, upon which Utah's rule is modeled, agree that a trial court occupies a rather unique super-

visory role in such cases.[4] Indicative of this role is the requirement of rule 23(e) that a trial court before which a class action is pending is required to approve any settlement of a class action. Utah Rule of Civil Procedure 23(e) states, "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Utah R.Civ.P. 23(e).[5] When, as in this case, an award of attorney fees will be collected from funds recovered by the class or is part of a settlement, that award necessarily becomes subject to the trial court's discretionary approval. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977). Approval by the trial court is required notwithstanding any agreement between the class representatives and their counsel concerning fees. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice*, ¶ 23.91 (2d ed. 1990); *see also* 7B C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1803 (2d ed. 1986). Approval of a fee award is contingent upon the trial court's satisfaction that the award is fair and reasonable. *See, e.g., Allen v. Alabama State Bd. of Educ.*, 612 F.Supp. 1046, 1054 (M.D.Ala. 1985), *rev'd on other grounds*, 816 F.2d 575 (11th Cir.1987); *Feuerstein v. Burns*, 569 F.Supp. 268 (S.D.Cal.1983); *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 165 (S.D.N.Y.1983).

The rationale behind the trial court's acting as monitor of relations between the parties and their counsel respecting fees is based on several concerns, among which are the following: First, the interests of all

---

**2.** It is worth noting that on this appeal, the class representative and class counsel do not fundamentally disagree. Both contend that the trial court's initial award of fees was appropriate.

**3.** Alternatively, counsel have prepared a stipulation to settle the controversy. That stipulation is discussed at the end of this opinion.

**4.** As is often the case when considering the operation of a philosophy behind our rules of civil procedure, we find little Utah precedent or

secondary commentary that is helpful in interpreting our rule 23. Therefore, we freely resort to federal precedent and commentary for enlightenment. *See Olson v. Salt Lake City School Dist.*, 724 P.2d 960, 965 n. 5 (Utah 1986); *Pate v. Marathon Steel Co.*, 692 P.2d 765, 767 n. 1 (Utah 1984).

**5.** Utah Rule of Civil Procedure 23(e) is identical to Federal Rule of Civil Procedure 23(e).

class members may not be adequately represented in dealings with class counsel. For example, in many situations, all class members will not be identified, and the court has the responsibility to "serve as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Second, in many class actions, the amount of any single class member's stake may be quite small and the individual member's motivation to carefully scrutinize any particular aspect of counsel's conduct in an agreement between the class representative and class counsel is correspondingly slight. This may make class members less vigilant about protecting their class interests when dealing with class counsel and when evaluating a settlement. The presence of the court can serve as a check on manipulation or exploitation of the class by its counsel. The whole philosophy of rule 23 with regard to the settlement or dismissal of class claims is to ensure that the court protects the class members from potential abuse. *See, e.g., In re Chicken Antitrust Litig.,* 560 F.Supp. 963, 967–68 (N.D.Ga.1980); *Cantor v. Detroit Edison Co.,* 86 F.R.D. 752, 758–59 (E.D.Mich.1980).

■ With this perspective, which we find fully applicable to our Utah rule 23, we return to the contention that the trial court erred when it entered a fee award lower than the twenty percent agreed upon. As noted, the mere fact that the class representatives and class counsel, and even opposing counsel, agree on a fee does not ensure that the concerns expressed in rule 23(e) have been resolved. Here, both class counsel and the class representatives argue that these concerns are not relevant because, in overwhelmingly giving their approval to the settlement, the class members approved an award of fees in excess of $7,000,000. Therefore, they argue, a fee of $5,800,000 is certainly fair and reasonable. This claim is without merit. While approv-

al of attorney fees by members of the class may be a factor to be considered in determining whether a particular fee is reasonable and should be awarded, such approval does not negate the need for the trial judge to fulfill the independent role assigned him or her by rule 23(e). The trial court's role in approving a class action settlement is not the simple nuisance the class representatives and class here perceive it to be; it is an important vehicle for assuring that the interests of all class members will be thoroughly considered by a neutral party before any settlement or award is approved.

■ As a variation on the claim that the court was bound by the agreement, class counsel suggest that a fee falling within the limits fixed by their agreement necessarily represents a reasonable fee under the circumstances. However, there is evidence in the record that would support a determination of a reasonable fee that falls far outside the limits set by the agreement.[6] On a record such as this, a trial court has broad discretion to determine what constitutes a reasonable fee, and we find no basis for cabining that discretion within the limits set by the agreement. *See Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988); *see also Ojeda v. Hackney,* 452 F.2d 947, 948 (5th Cir.1972) (per curiam).

■ The second claim made by class counsel is that the law-of-the-case doctrine bars the trial court from reassessing its December 5th order fixing the fee at $5,800,000. The law-of-the-case doctrine generally provides that a decision on an issue at one stage of a case is binding in successive stages of the same litigation. *See, e.g., Mascaro v. Davis,* 741 P.2d 938, 946–47 (Utah 1987); *Sittner v. Big Horn Tar Sands & Oil, Inc.,* 692 P.2d 735, 736 (Utah 1984). However, this doctrine does not prevent a judge from reconsidering his or her previous nonfinal orders. 1B J. Moore, J. Lucas & T. Currier, *Moore's Fed-*

---

**6.** In their agreed statement in lieu of record on appeal, attorneys for class counsel note that various affidavits were submitted to the trial court on the question of what constitutes a

reasonable award of attorney fees in this matter. The fees suggested as reasonable in these affidavits range from $7,250,000 to $1,500,000.

*eral Practice* ¶ 0.404[4.–1] (2d ed. 1988). As Justice Holmes once noted, the law-of-the-case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). This principle, as stated by Justice Holmes, also applies generally in state courts. *See* 46 Am.Jur.2d *Judgments* § 400 (1969). Because the trial court's initial fee determination was not a final order, it is subject to revision by the same judge who entered it until a final judgment is handed down. *See* Utah R.Civ.P. 54(b). Therefore, the law-of-the-case doctrine was not offended by the trial court's October 31st order.

 In their third challenge to the fee award, class counsel contend that the trial court abused its discretion by employing the so-called "lodestar" approach [7] to determine the amount of the fee it fixed in its October 31, 1989 order. Class counsel argue that most courts considering the question have held that a lodestar approach is not a proper method for determining a reasonable fee award and that even if it is otherwise proper, it is not appropriate for "common fund" cases such as this one, where the fee is collected from money recovered by the plaintiffs.

We cannot say that the trial court erred in using a lodestar analysis. First, contrary to class counsel's claims, the lodestar approach is not universally rejected as an appropriate method for determining fees in a common fund case. There is a broad split of authority on this question. Some courts have disfavored the approach, *see, e.g., In re Activision Sec. Litig.,* 723 F.Supp. 1373, 1376 (N.D.Cal.1989), but others adhere to it; *see, e.g., Grunin v. International House of Pancakes,* 513 F.2d 114, 124–29 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468–74 (2d Cir.1974); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1296, 1305 (E.D.N.Y.1985). Second, even if a pure lodestar approach might be disfavored in a common fund case, the trial court here did not use a pure lodestar approach, but weighed the results of the lodestar analysis along with other relevant factors before making its conclusion.[8] For these reasons, we cannot say that the trial court abused its discretion in performing a lodestar analysis.

The final contention of class counsel is that the proceedings before the master were so flawed as to invalidate the October 31st fee reduction order, which, they contend, was based upon the master's recommendation. We find merit in this contention.

Class counsel's attack on the activities of the special master are grounded in rule 53 of the Utah Rules of Civil Procedure, which governs the appointment of special masters.[9]

Rule 53 provides in relevant part:

> used to determine a reasonable fee. These factors include but are not limited to a lodestar analysis, a review of rule 1.5 of the Rules of Professional Conduct promulgated by this court, the agreement for settlement of litigation, the Thrift Settlement Financing Act, the special master's final report, and the percentage of the total common fund to be used for class counsel fees.

**7.** "Lodestar" is a term which was coined by the court in *Lindy Brothers, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973). Under this approach, the court starts by determining the hours counsel has reasonably spent on the case and then adjusts the hourly compensation either up or down by a multiplier the court determines appropriate. In determining the multiplier, the court considers various factors, among them the quality of the work performed, the contingent nature of the case, the plaintiff's burden, the risks assumed in developing the case, and the delay in the receipt of the payment. *See generally* 78 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1803 (2d ed. 1986).

**8.** In his memorandum decision of October 31, 1989, the trial judge delineates several factors he

**9.** Rule 53 of the Federal Rules of Civil Procedure is almost identical to the Utah rule. Because there is virtually no case law interpreting the Utah rule and because of the close correspondence between the federal and state rules, we freely look to federal case law as a useful guide. *See Pate v. Marathon Steel Co.,* 692 P.2d at 767 n. 1.

(b) A reference to a master shall be the exception and not the rule.... [I]n actions to be tried without a jury, save in matters of account, a reference shall, in the absence of the written consent of the parties, be made only upon a showing that some exceptional condition requires it.

(c) The order of reference to a master may specify or limit his [or her] powers and may direct him [or her] to report only upon particular issues or to do or perform particular acts or to receive and report evidence only.

Utah R.Civ.P. 53. Class counsel argue that the issue of attorney fees does not amount to an "exceptional condition" within the meaning of rule 53(b) that justifies reference of this issue to a master. Therefore, they contend, reference on this issue was an abuse of discretion. They also argue that even if reference to the special master on the issue of attorney fees was appropriate, the activities of the special master in this case exceeded both the scope of his appointment and the permissible duties of a special master under rule 53(c).

In addressing these claims, we must analyze the reference to the master and the proceedings before him in light of the requirements of rule 53. To do this, we must determine the following: (i) whether the initial reference to the master was proper under rule 53(b); (ii) whether the court was acting within its discretion when it enlarged the reference to correspond with what the master had done; (iii) whether the scope of the master's duties in the "clarifying" order of July 17, 1989, go beyond the allowable scope of duties that can be given a special master under rule 53(c); and (iv) whether the special master proceeded properly in carrying out his duties. If we find error in any respect, we must vacate the order unless the error was harmless.

■ We first address class counsel's claim that the issue of the amount of attorney fees to be awarded is one that can never properly be referred to a special master. We do not agree with such a categorical proposition.[10] In our view, the preferred way to determine whether an issue, such as the proper amount of attorney fees, is appropriate for reference to a special master is not to focus on the category into which the issue falls, but to consider the facts underlying the referred issue to determine whether they constitute an "exceptional condition" justifying the reference under rule 53(b).

Class counsel cite *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), as support for their contention that the issue of attorney fees does not present an exceptional condition within the meaning of rule 53. In *La Buy*, the Supreme Court took a strict approach to the use of special masters. It held that reference to a special master cannot be justified under the "exceptional condition" language by congested court calendars, by the complexity of the issues, or by the possibility of a very lengthy trial. *Id.* at 259, 77 S.Ct. at 315.

■ The federal approach to the use of special masters and the Supreme Court's interpretation of the terms of rule 53(b) are not, of course, binding on us. The federal precedent is to be followed only to the degree that it is persuasive. We do not find *La Buy* persuasive. It was decided some thirty years ago, long before the current widespread use of magistrates by federal courts (and the analogous use of commissioners in our own state courts) had developed. This casts serious doubt on the strength of the precedent in the federal system. Moreover, we find *La Buy* to be inconsistent with our own approach to the flexible use of judicial resources. We see little virtue in an interpretation of rule 53(b) that unnecessarily narrows a trial judge's options in dealing efficiently with the issues presented for decision. Given the size of the fee requested and the numerous legal and factual issues to be con-

---

**10.** One older federal court of appeals decision says by way of dictum that reference to a special master to determine the amount of counsel fees is permissible, although it opines that such reference should be discouraged. *In re Irving–Austin Bldg. Corp.*, 100 F.2d 574, 577 (7th Cir. 1938).

sidered, we think the attorney fees issue in the case is complex enough to warrant referral to a special master. Thus, had the trial court simply directed the master to report on the issue of the amount of a reasonable attorney fee, it would not have amounted to an abuse of discretion.

Having found that the complexity of the attorney fees issue would justify referral to a special master, we address the contention that even if such a reference would be permissible, the court below did not ask the master to report on attorney fees until after the fact. Therefore, it is contended, the master impermissibly exceeded the scope of his initial appointment. Rule 53(c) provides that the court may specify or limit the master's powers and may direct the master to report only upon particular issues. *See* Utah R.Civ.P. 53(c). In explaining the permissible scope of a master's authority, one treatise states:

> The scope of the master's authority "may" be specified or limited by the order of reference. If so, the order of reference is "at once the chart and limitation of the master's authority." And the master should not exceed it even with the consent of the parties. The order of reference may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only. But as indicated by the use of the word "may" in the first sentence and by the general grant of power given by the second sentence of subdivision (c), a reference containing no limitations is a general reference to report on all the issues, both of law and fact, involved in the litigation.

5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 53.06 (2d ed. 1990) (footnotes omitted) (quoting *Ferguson Contracting Co. v. Manhattan Trust Co.*, 118 F. 791, 794 (6th Cir.1902)).

In the present case, the master was not given a general reference to report on all the issues; he was directed to review requests for cost reimbursements. By investigating and reporting on the issue of attorney fees, he clearly exceeded the scope of his appointment. If there were no more to

the matter, we would find that the master exceeded the scope of his authority. However, here, after class counsel challenged his preliminary report, the trial court attempted to retroactively expand the scope of the master's referral to cover what was actually done. Whether this attempt at retroactive expansion might be effective under some circumstances is a question which we decline to reach today. As discussed below, we find that the entire mode of proceeding followed by the master was improper as a matter of law. That fact makes it unneccessary for us to reach the question of the retroactive expansion of the scope of the referral.

As noted, the last contention of the class counsel is that the proceedings before the master were improperly conducted and that they tainted the trial court's order of October 31st. The record we have before us is limited. The only evidence we have of what the master did is his billing statements and his interim and final reports. The record contains evidence of one formal hearing held before the master. Although we do not have a transcript or summary of the hearing, we know that it was on the issue of attorney fees, and we know that it was held after the master had filed three interim reports, two of which specifically dealt with this same issue. Furthermore, class counsel argue that the master gathered much of his information through *ex parte* investigation of facts about the performance of class counsel and through *ex parte* contacts with the trial court. The special master's billing records indicate several "conferences" with the judge. If such *ex parte* conferences occurred, they were clearly improper.

The United States Supreme Court has stated that a special master has "the duties and obligations of a judicial officer." *In re Gilbert*, 276 U.S. 6, 9, 48 S.Ct. 210, 211, 72 L.Ed. 441 (1928). The master's role appears somewhat similar to that of a magistrate in the federal system. Federal rule 53 originally allowed a majority of judges within any district to appoint "standing masters" within their district. *See* 9 C. Wright & A. Miller, *Federal Prac-*

*tice and Procedure* § 2607 (1971). This provision, however, was deleted in 1983 because the creation of full-time magistrates eliminated the need for such masters. *Id.* § 2607 (Supp.1990). We see no reason why we should view masters any differently. We think that they are most analogous to commissioners when acting in the performance of their duties. Therefore, they owe similar ethical obligations to the court, the parties, and the public. While it is true that a master is empowered by the order of reference, which may be quite broad, we conclude that he or she is still bound by the ethical obligations and restraints of a judicial officer. Thus, a master should not engage in *ex parte* contacts with the judge overseeing the case on matters pertinent to the substance of the referral. *See generally* Utah Code Judicial Conduct *passim.*

But we need not base our decision on the inferential evidence of *ex parte* contacts. In addition, there is a more fundamental error in the proceedings below which in itself is sufficient to require reversal in this case. Based on the record and class counsel's uncontradicted account of the proceedings, we assume that class counsel were never given notice that the December 5th fee award was being reassessed by the master. Furthermore, they were not given an opportunity to present evidence on the issue of attorney fees until after the master had already recommended to the trial court the amount he considered a "reasonable" fee, $3,900,000. After that point, class counsel were given only a minimal opportunity to challenge the master's assumptions and conclusions.

In our judicial system, except in extraordinary circumstances that are not present here, all parties are entitled to notice that a particular issue is being considered by a court and to an opportunity to present evidence and argument on that issue before decision. *See Nelson v. Jacobsen,* 669 P.2d 1207, 1211–12 (Utah 1983); *Highbarger v. Thornock,* 94 Idaho 829, 831–32, 498 P.2d

1302, 1304 (1972). The failure to give adequate notice and opportunity to participate can constitute a denial of due process under article I, section 7 of the Utah Constitution. Utah Const. art. I, § 7. " 'Many cases have held that where notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him [or her] or not given sufficiently in advance of the proceeding to permit preparation, a party is deprived of due process.' " *Cornish Town v. Koller,* 798 P.2d 753, 756 (Utah 1990) (quoting *Nelson,* 669 P.2d at 1212). " 'Timely and adequate notice and an opportunity to be heard in a meaningful way are at the very heart of procedural fairness.' " *Id.* (quoting *Nelson,* 669 P.2d at 1211); *see also Bunnell v. Industrial Comm'n,* 740 P.2d 1331, 1334 (Utah 1987) (administrative law judge's conduct, including refusal to hear argument, denied claimant due process of law).

Regardless of whether the procedures in this case are so extreme as to deny class counsel the due process guaranteed under article I, section 7,[11] we find that, at a minimum, the trial court abused its discretion in adopting the findings of the special master after being informed that the parties had no notice that the special master was to review the reasonableness of attorney fees and that they had insufficient opportunity to participate in the proceedings the master conducted. *See Cornish Town,* 798 P.2d 753 (Utah 1990).

After the fact, the trial court tried to justify the master's course of conduct by stating that it had been concerned about the lack of a true adversarial relationship between class counsel and the class representatives with regard to the issue of attorney fees. Given the broad equitable powers of the court in managing a class action case, a judge who is concerned that the class is not being represented adequately on an attorney fees issue might more appropriately appoint special counsel for the class or insist that one be hired, rather than expect the master to fulfill an adver-

**11.** The facts of this case appear more extreme than those involved in *Bunnell v. Industrial Commission,* 740 P.2d 1331 (Utah 1987), in which the majority held that the conduct of the administrative law judge denied due process.

sary role. *See generally* 7B C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1791, 1803 (2d ed. 1986).

Having found error, the next issue we must consider is whether this error was harmless. The standard for determining harmless error is whether it is reasonably likely that the trial court's final order would have been different absent the master's improper activities. *See State v. Ramsey,* 782 P.2d 480, 485 (Utah 1989); *State v. Knight,* 734 P.2d 913, 919–23 (Utah 1987). In the present case, class counsel argue that the only explanation for the trial court's reduction of fees is the recommendation of the master. In his memorandum decision, the judge conceded that input from the special master helped him determine what constituted a reasonable fee; however, he also stated that he had always been concerned about the lack of "a truly adversarial situation as to counsel fees." Under this circumstance, it is fairly clear that he was influenced by several factors, including the impermissible activities of the master. Although we cannot tell with any precision the degree to which he was influenced, we conclude that the reasonable likelihood standard is met here. *See Knight,* 734 P.2d at 919–23.

It would be appropriate to vacate the fee award and remand for a redetermination of fees after a full hearing, held before the trial court or a properly appointed master, of which the parties have notice and are allowed to present evidence in open court. However, in this particular instance another remedy is available. The parties here have entered into a stipulation that provides as follows:

a) A reasonable fee in this matter to be awarded to Appellants is the sum of $5,400,000, as of December 6, 1988, together with interest which has accrued thereon. This Court should enter an order in settlement of this Appeal awarding Appellants such amount;

b) The sum of $400,000, together with interest which has accrued thereon from and after December 6, 1988, should be disbursed to and held by the Appellees' representative, the Depositors of Insured Thrifts (DOIT), for and on behalf of the Appellees and the depositor class to enable Appellees to meet and pay the ongoing expenses of litigation and other expenses as determined by DOIT necessary to further the interests of the class and at the conclusion of the litigation to pay the balance to the class. This Court should enter an order in settlement of the Appeal, directing the distribution of such award.

c) Twenty percent (20%) is the percentage the parties agree constitutes a reasonable attorney's fee on all amounts recovered for and on behalf of Appellees in the future. The Court should enter an order in settlement of this appeal approving twenty percent (20%) attorney's fee for Appellants on all amounts recovered for and on behalf of Appellees hereafter under the original Fee Agreement between the parties.

This stipulation has been reached between class counsel and class representatives who, for purposes of this proceeding only, are represented by separate counsel. At oral argument, when pressed, counsel for class counsel conceded that if the court declined to approve the future fees provision of the stipulation, class counsel would agree to be bound by the other provisions of the stipulation.

Ordinarily, we would vacate and remand this matter to the trial court, even in the presence of a stipulation. However, that course, which Justice Howe advocates, is unnecessary under the peculiar facts of this case. Under these facts, we approve parts a) and b) of the stipulation. We will not approve part c) for several reasons. First, it would amount to removing the trial court from the further performance of part of the function assigned to it under rule 23(e) to assure that the class members are not disadvantaged in any settlement of an action. Second, we do not know anything about the merits of claims that may be asserted as this action continues against the nonsettling defendants. Therefore, we are entirely unable to judge whether recovery on such claims may justify the stipulated contingent fee.

We emphasize that we are approving the stipulation as to parts a) and b) under facts before us and are not merely acquiescing to the stipulation between class counsel and the class representatives. Exercising the power conferred on the court by rule 23(e), we are persuaded to approve parts a) and b) of the stipulation by a number of factors, including the following: (i) before this court, the class representatives are separately represented as to the fee issue; (ii) many of the usual concerns about the inability of class members and representatives to adequately protect themselves are not present here because the members had an opportunity to opt out of any settlement and voice any objections to the award; (iii) each class member has a substantial stake in the litigation, thus making those members more likely to scrutinize the proposed terms closely; and (iv) the settlement, including a proposed fee award several million dollars higher than now awarded, was approved by virtually all class members.

The trial court's order of October 31, 1989, is vacated insofar as it fixed an attorney fee award, and this matter is remanded for entry of an attorney fee award consistent with this opinion.

HALL, C.J., and DURHAM, J., concur.

STEWART, Justice, concurring:

I join Justice Zimmerman in approving parts a) and b) of the stipulation. However, I do not agree that the use of a master was appropriate in this case.

Rule 53(b) of the Utah Rules of Civil Procedure provides, "A reference to a master shall be the exception and not the rule." That Rule also states that "in actions to be tried without a jury, save in matters of account, a reference shall, in the absence of the written consent of the parties, be made only upon a showing that *some exceptional condition requires it.*" (Emphasis added.)

As the majority opinion indicates, Utah Rule 53(b) is virtually the same as the federal rule, and we look to federal case law as a guide in interpreting our own rule. According to Wright and Miller, "Because the use of masters is expensive and frequently leads to delay, reference to a mas-

ter is justified only in very rare cases." 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2601, at 776–77 (1971) (footnotes omitted). Also,

[i]t is a matter of common knowledge that references greatly increase the cost of litigation and delay and postpone the end of litigation. References are expensive and time-consuming. The delay in some instances is unbelievably long. Likewise, the increase in cost is heavy. For nearly a century, litigants and members of the bar have been crying against this avoidable burden of costs and this inexcusable delay.

*Adventures in Good Eating, Inc. v. Best Places to Eat, Inc.,* 131 F.2d 809, 815 (7th Cir.1942).

The undesirability of a reference to a master is even greater in nonjury cases such as this. According to one commentator, "With a few minor exceptions, references in non-jury cases run counter to the spirit and purpose of judicial administration in the federal courts." Kaufman, *Masters in the Federal Courts: Rule 53*, 58 Colum. L.Rev. 452, 459 (1958). One reason for this is that in nonjury cases, the court is required to accept the master's findings of fact unless clearly erroneous. *See* Utah R.Civ.P. 53(e)(2). In comparison, "[i]n jury cases the master's findings, if accepted by the court, constitute merely prima facie evidence to be submitted to the jury for its consideration." Kaufman, 58 Colum.L. Rev. at 460.

The authorities quoted above demonstrate that masters should only be used in exceptional cases involving extremely complex litigation and imposing a significant burden on the court. Furthermore, in nonjury cases, Rule 53(b) requires a showing of an exceptional condition before a master may appropriately be used. No such showing has been made in this case. The determination of attorney fees in this class action suit may have been difficult, but it certainly did not involve complex, factual, or legal issues. The dollar amount involved is large. That does not mean that the basic considerations and issues are substantially different from any other case

**746**

involving the award of attorney fees. The trial court would not have been significantly burdened by deciding the issue itself. That the amount of the fee involved has stirred wide public interest is no justification for referring the matter to a master. For these reasons, I would hold that the use of a master was inappropriate in this case.

Furthermore, I disagree with the majority's statement that the roles of a master and a magistrate are similar in the federal system. Although magistrates may be appointed to act as masters, the duties of a magistrate are much broader. *See* Federal Magistrates Act, 82 Stat. 1107–1114 (1968), 28 U.S.C. §§ 631–39 (1988). *See also* Note, *Masters and Magistrates in the Federal Courts*, 88 Harv.L.Rev. 779, 796–97 (1975). Also, unless a reference to a magistrate expressly states otherwise, magistrates appointed to act as masters are specifically excepted from the requirements of Rule 53 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 53(f). In my view, it is a mistake for this Court to look to the treatment of federal magistrates for purposes of analogy to the treatment of masters under Rule 53.

HOWE, Associate Chief Justice, concurring and dissenting:

I concur in the majority opinion, except that I would remand the case to the trial court for final determination of the amount of fees to be awarded. Since we have determined that the trial court erroneously relied on the flawed master's report, the proper procedure in my opinion is to remand the issue back to the trial court for reconsideration and final determination without regard to the report. I believe that it is premature for us to accept and approve the stipulation without first allowing it to be presented to and considered by the trial court.